The appellant, Hugh Drake, for the Act of E. William Sievers. Okay, Mr. Drake, you may proceed.  Thank you. Thank you. Thank you. Good morning. May it please the court, counsel. I'm Hugh Drake. I'm the attorney for the appellants. The appellants are the three surviving sisters of the deceased. On February 6, 1997, the decedent and his then betrothed, Doris Kleinlein, signed an annuptial agreement. That annuptial agreement contains three separate sections which preserve the rights of the parties to distribute the assets as they see fit. This is the usual annuptial agreement. What's yours is yours. What's mine is mine. We can do with it as we want in life or in death, including if we want to leave it to one another. We can do that, but we're free to do with it as we will. Three sections in the annuptial agreement which controls that. And then there's an additional section tacked on at the end of the annuptial agreement which says, and you must create a will leaving your assets ex-pliant. That was in 1997. In 2012, Glenn Kleinlein died, leaving a valid last will and testament. The last will and testament bequeathed all of his personal effects, household goods, automobiles, chattels, and the marital residence to Doris Kleinlein, the surviving spouse, the appellee. Additionally, the appellee was to receive the residue and remainder of the decedent's estate. However, he did treat specifically his family farm and the farm machinery and equipment as follows. One-fourth to the surviving spouse and three-fourths in equal shares to his surviving sisters, Betty Rigg, Eva Mae Pruden, and Ida Bell Coffman. Those are the appellants. Those are my clients. The claim was brought under the annuptial agreement by Doris Kleinlein because she said that the provisions in the annuptial agreement entitled her to everything, to all of the family farm. Those three-fourths that were left to the surviving sisters, that was a breach of contract. The trial judge, looking at the ambiguity of the agreement with these presumably conflicting provisions, determined that the annuptial agreement was unambiguous and summary judgment was entered in favor of the appellee, the surviving spouse. To resolve this case, the court has to address the threshold question, did the trial court err in finding that the annuptial agreement was unambiguous and yet the trial court still employed rules of construction and still considered limited extrinsic evidence in making that determination that the contract was unambiguous? What was the limited extrinsic evidence? Your Honor, in the order, the trial court indicates apparently a draft will was drafted by Glenn's attorney, Hallahan, which was consistent with the annuptial agreement but was never signed. All of the extrinsic evidence that was considered in the case just came about through the presentation of the pleadings and through oral argument. It was just anecdotal evidence. There was no presentation of facts, no presentation of evidence, because this was a question of law. While it's true that if a contract is ambiguous, once it's deemed ambiguous, a court can look to the conduct of the parties as an aid to construction of what their agreement was supposed to mean. But it's inappropriate for the trial court to consider that information without first making that determination that the contract is ambiguous. Not to mention, in this case, the existence of the draft will should have remained subject to attorney-client privilege. There's no question, given that it's in the order, that the trial court is using the existence of a draft will as evidence of what was intended by the agreement. Here's a tape from the court's finding that it based its finding on the four corners of the annuptial agreement. It appears to be in conflict with actually what was cited in the order. What was said in the order. But what in the record suggests that that was relied upon. When the trial court, as the one making the determination, says, I'm making this based on the four corners of the instrument. Presumably the trial court wouldn't actually cite the two extrinsic evidence that was presented through the pleadings. If it wasn't actually using that evidence. It would be completely extraneous. It would have no bearing upon its ruling. We're going to have to be real careful in future opinions in Rule 23 orders not to say anything that we don't later rely on. Clearly there was an enormous amount of extrinsic evidence. There was additional extrinsic evidence, I would say. Anecdotal evidence about what was intended by the parties. Additionally, rules of construction that the court relies upon should not be used unless the contract is first deemed to be ambiguous. And that goes into great detail as the underpinnings of its argument. Although, as you say, it also indicates that it's looking just to the four corners of the document. Well, if you look at the four corners of an insurance contract, don't you consider the different parts of it? And is it a rule of construction that requires ambiguity when you decide one section is more specific than the other? Is that a rule of construction? I guess it is, but is it a rule of construction that is somehow forbidden by first saying, this isn't ambiguous, and this is a hypothetical. I'm not talking about a will or a trust. There's a general provision and there's a more specific provision. More specific provision controls. That's a principle of law in contracts, for example. Does that mean that the whole insurance contract or the whole insurance policy was ambiguous? Or does it mean that you read it as it was written? I appreciate your point. I'm not sure that there is any law which distinguishes that this is a rule of construction  And there are cases, obviously cited by the appellee, and those are specifically Olson and Premier Title instances where this specific general comes to bear within a consideration of the four corners of the document. However, it is clearly law that rules of construction, plainly stated, are not to be applied. Whether or not this is a rule of construction or some unique rule of construction or some other animal, I'm not sure. Is there a standard of review de novo? It is, Your Honor. So why should we care whether the trial court looked to extrinsic evidence? We're just going to look at the four corners of the contract. Wouldn't that be correct? Can I ask you another question? Was there any extrinsic evidence provided about whether Mrs. Kleinlein ever executed a will in conformance with the Anti-Nuptial Agreement? No. And then there was no discovery in that regard that I can recall. Specifically, there was no presentation of evidence on those issues. So there was no bigger picture in terms of extrinsic evidence. If we were to hold that the Anti-Nuptial Agreement is ambiguous, then it would go back to the trial court, and then the trial court would be free to use rules of construction and hear parole evidence, I suppose, of some kind? Typically, when there's a determination that a contract is ambiguous, that's what a court is going to do, and it's going to allow, determine what the surrounding circumstances were when that contract was entered into. In this case, our contention is that these provisions deal with the exact same subject matter in very specific ways, and that they are so contrary to one another that the presentation of extrinsic evidence probably is not going to aid in the interpretation of what was intended. They are fundamentally opposed to one another. They deal with the exact same subject matter. This is not a general, specific consideration. Could Hallahan testify? Yes. What if he said, I screwed up? I shouldn't have had those Section 3 in there, or the sections that conflict with the more specific Section 9, or whatever section it is? He said, that was the form I used, I didn't read it carefully, they told me they wanted this part. Is that going to come in? It's certainly possible, but it would be a question as to whether or not you could have extrinsic evidence which fundamentally rebuts what's in the contract. It's a question about who could testify as to the intent of the decedent, given the dead man's act. But those are all questions of evidence. It seems to me like the lawyer is not the person who is going to benefit from any testimony, and that he would be the person who would know. The other thing you think about is, she was unrepresentative. So you would construe the contract really against Mr. Kleinwein. He had the lawyer. The distinction was made about the rule of construction with respect to specific and general provisions, and if it's applied prior to a contract being deemed ambiguous. Very clearly, that provision of ruling against the drafter is a rule of construction that is only to be applied after the contract is first deemed ambiguous. What I'm getting at is, even if we were to reverse this case and send it back, it doesn't mean your clients are going to win. No, correct. In short, the trial court shouldn't have held that the antenuptial agreement was unambiguous and still employed the rules of contract construction and considered this limited extrinsic evidence. With respect to this issue of specific versus general, the two cases cited by the Appellees on that issue, Olson and Premier Teitel, when you look at the entire cases, it's very clear they were able to say, when we look at the whole contract is. And that way, you modify, you're able to look at the general provisions in light of the intention of the entire contract. And in those instances, they were able to say, with these apparently conflicting provisions, the one that was deemed to be more specific, that's representative of what the contract was that you want to hold. This is not an instance where, if you have several provisions that say, you can do with your property whatever you like in life or in death, with no encumbrances, and then a separate provision that says, you must do with your property upon your death, X, Y, and Z. Those two things are completely in conflict and on the exact same subject matter. They are both specific provisions on that subject matter. The distinction that the Appellee tries to make, and that the Court made in its order, is that, well, the provision that says you must leave your property X, Y, and Z, it uses the individual names. It doesn't say parties. All of these other provisions, which constitute 90 plus percent of the document, they refer to parties. And so that's what makes this a specific provision, as opposed to all the others, which should be characterized as boilerplate and ignored as a result. But it's completely arbitrary. Obviously, the term parties is a defined term. And are we to ignore every provision that uses the term parties by virtue of it now being general provisions? General versus specific is an issue of subject matter. It's not an issue of how the parties are referred to. Well, under your theory then, Counsel, Section 9 means absolutely nothing, correct? Well, it's a question. You're either going to say one section or the other. One section or the other three mean absolutely nothing. So the other three mean nothing if we accept Section 9 is a valid provision? Correct. Correct. You're going to completely ignore it. And that's why we say that this is a fundamental disagreement. But the other three entail more than just what the parties can do at death in terms of a will. They speak to what can happen with property during their lifetime. Correct. So that is a difference, is it not, from Section 9? It is. It is, yeah. Why does that mean that Section 9 is more specific and therefore controlled? I would say no, because it doesn't change what those sections hold in terms of what can be done upon death. It just includes other issues. It just says what you can do with it in life or upon death. And to then ignore the or upon death, had that been in its own paragraph number, would it have made a difference? That seems relatively arbitrary as well. What we're saying is these are so fundamentally opposed that the presentation of extrinsic evidence is not going to aid in the interpretation that there are times where a contract is so internally conflicted. Do you think the clause embodying the provisions of this agreement makes any difference? Which is in the first sentence of Section 9. Each party shall execute a proper will embodying the provisions of this agreement. I can't see how that... So if it were to embody the provisions of the agreement, I don't know that it makes it more or less specific than the other provisions. I'm not sure what embodying the provisions of this agreement connotes either, but that seems to me to tie it all together at the end, possibly at least, and say that part of this whole agreement now, as we get down to Section 9 towards the end, is that they're going to agree what they're going to do to the property they still own at their deaths. Pretty commonly in contracts, wills, and trusts, you'll see the preface that irrespective of any other terms in this contract, to the contrary, the party shall x, y, and z. Is that what it means? No. Well, that would be a stretch from my perspective. If that term had been used, or if that phrase had been used, that might have been instructive. But I'm not sure that that's the same thing. Okay, so back to my question. What does it mean then? I'm not sure. Okay. I'm not either. Given the fundamental flaws we see in the Antinomial Agreement, we ask the court to find that the directly conflicting language constitutes an unresolvable ambiguity and hold that no contract exists. Thank you. Thank you, Mr. Drake. Mr. Sievers? If it pleases the court, counsel, my name is Bill Sievers, and I'm here on behalf of Doris Kleinlein. Doris just celebrated her 80th birthday, and I think today is the first hearing that she has not attended throughout this proceedings, and I am under strict orders, Your Honors, to apologize on Doris' behalf for her not being here. She's recovering from surgery. So when I get back to Quincy today, that will be the first question she asks me, so I have to have that on the record here at some point. Illinois law supports and enforces prenuptial agreements. The Premarital Agreement Act, which we cite in our brief, specifically authorizes provisions to be included within prenups regarding creations of wills, trusts, and plans. The prenuptial agreement that Glenn and Doris Kleinlein executed from our perspective is clear as to what it requires their respective estate plans to provide. In fact, the prenuptial agreement requires that they take action and that they execute wills. From Glenn's perspective, the will executed by Glenn Irving Kleinlein shall provide that he will leave his estate to Doris E. Long if she survives him. That provision required Glenn to take action. It's a very specific provision from our perspective. As the trial court concluded, and we've asked this court to affirm, it controls, it embodies the agreement that was entered by the parties. Okay, what does that mean? Getting back to the questions I asked counsel, what does embodying the provisions of this agreement mean from your perspective? From our perspective, Judge, it's contained right there in that paragraph. That is the agreement. The parties will execute a will embodying the terms of this agreement. And their agreement was Glenn will execute a will leaving his estate to Doris if she survives. Would you agree that other earlier language is superfluous? And the other provisions, I mean, when it makes reference to, I mean, it's perfectly clear that they both wanted to be able to do stuff with their separate property while they were alive. Correct, Judge. Okay, so they could have just said, I can do whatever I want with this while I'm alive. Correct. I can give it to anybody. I can give it to you. I can take it away. I can sell it. I can give it to a showgirl in Las Vegas. Whatever I want to do, you can't do anything about it. But this provision, if that were the only one we were considering, would be, whatever I got left, I'm giving to you. Correct. But there's language in those earlier provisions that makes it sound like, you know, it's talking about gifts, requests, wills, etc. So are those reconcilable? I believe that those, we believe that those yield to the more specific provision in Section 9, Judge. Those would then be superfluous. Some of the phrases or choice of words were unnecessary, could lead a reader down the wrong path, could cause an ambiguity. Could cause contract cases to end up before a court like this. And that's what you see in the line of cases that both brilliant draftsmanship masterpiece. No. But you can read the agreement just like the trial court did and determine what the intent of the parties was as regard to their estate plans. Wouldn't the intent of the parties be crystal clear if they'd gone out and executed a will following this antinuptial agreement? Leaving all of their property to each other? Oh, that would have been great if Glenn would have honored his promise. He made a promise in the agreement. He did not honor his promise. In fact, he could have done nothing and still honored his promise. Did Doris honor her promise? Judge, I'd have to answer that question. That was not part of the... I'm just curious. My understanding is that  Do you know that? No, Judge. It was not Hallahan. It was a Quincy attorney. It was not me or anybody. Do you know what year that would have been? That was at the time, I don't know Judge. I believe it was at the time of the, shortly after the marriage. She had, as you can see from the provisions, very specific regarding her family situation. Mr. Kleinlein was not married previously and had no kids. She was married previously and had daughters. So obviously there was the provisions regarding his life interest and what her assets were and then down to her kids upon his passing. If we were to find that this was ambiguous and we sent it back, would evidence about whether she went out and executed a will in compliance with this come into evidence? I suppose it could come in, but I don't know the relevance of that. Well, if you find it's ambiguous, you're looking to determine the intent of the parties. And if she went out and executed a will in compliance with Section 9, that might help the trial judge know exactly what her intent was at least. I would agree, Judge. Obviously the trial judge is faced with the four corners of the document and ruled upon the circumstances presented, just like in the line of cases that are cited where you have these potentially conflicting provisions and agreements. They're not potentially conflicting, they're conflicting. So I'm having a lot of trouble seeing how somebody can say this is clearly unambiguous. As far as the ambiguity and the determination of ambiguity, the cases discuss that a contract is ambiguous if it's reasonably susceptible of being understood in more than one sense or is obscure in meaning. And the presence of two, and that's from Lima Lake case, the presence of two necessarily. And that's from the premier title case. And it's our position, as the trial court concluded, that these, that Section 9 is more specific, embodies the parties agreement with regard to their estate planning obligations, and that the other provisions relied upon by Mr. Drake's clients would yield to that specific provision. Isn't agreement in Section 9 talking about the anti-nuptial agreement? It says each party shall execute a proper will embodying the provisions of this agreement. Isn't the agreement that it's referring to is the anti-nuptial agreement? I would agree, but then it specifically says what the wills will provide. And Judge, I've read a lot of prenups in my career. This is a unique provision. Section 9 is unique? You would see, in just about any form book you'd pick up, you'd see the previous provisions. But you're not going to see that one in any form. That was crafted specifically for the parties of this agreement. If he drafted a, instead of a will, as he did, a trust agreement, an inter-vitalist trust agreement, leaving three quarters of the property to his sisters, income payable to him for life, and then theirs outright at his death, would that comport with this agreement? Not with the technical terms of the agreement. Why not? He's still alive. He's disposing of his property. The provisions say that. He can do whatever he wants. How would that violate Section 9? Because at the time, at his death, he doesn't really own three-fourths of that property. He's transferred it to his sisters in trust. Based on that hypothetical, I think there would be a fair argument for Doris or anybody in her position to make that this agreement created an obligation on his behalf to pass his property by will and leave his estate to her. I think that an argument could be made under the facts that you proposed that there would be some sort of constructive obligation, constructive trust imposed upon his assets. I don't know if that would be successful or not. Then you're saying he couldn't gift all the property away prior to his death. Because I think you already said that that's what those other, how those other provisions were different than Section 9. He could get rid of any of his property, just as Connect said. He could give it to somebody in Las Vegas, I think he said, if he wanted to. Showgirl, I think. Something like that. I've read stories like that. You'll have to tell me about them later. Judge, I can't stand here and say that that would be an absolute consistent term with the provisions of this agreement. I'm not sure it's even detrimental to your position. What if he reduced everything to cash and put it in CDs jointly titled with his sisters? There are cases, Judge, where it indicates that those types of actions that would be inconsistent with an ancillary agreement, there's a constructive trust imposed to enforce that. The Olson case, which is a divorce-related case that we cite, was somewhat along those lines where you get down to the interpretation of what retirement assets were going to be distributed between the married couple. And upon retirement, the husband was going to give half of the value of his stock to his wife if she survived. I mean, I'm sorry, if she hadn't remarried at the time of retirement. Well, he just went out and cashed them out, didn't really tell anybody, and then held the money. And somebody cries foul after the court essentially said, no, the overall intent was that half of that money would go to Mrs. Olson. And so I think that obviously that was the fact-based intensive reviews by the courts, but we had there the Illinois Supreme Court saying, no, this is what the parties intended. Mr. Kleinlein's sisters obviously have a million and a half reasons to ignore Section 9 of the agreement. And we understand why they wouldn't even want to put those words in their written submissions to the court, but Section 9 says what it says. We believe it's clear as to what the parties intended with regard to their estate plans, and that unfortunately Mr. Kleinlein broke his promise. We would request the court affirm the trial court's ruling, understanding that this is de novo review, and enforce the prenuptial agreement, which required 100% of Mr. Kleinlein's estate to be left to Doris, his surviving spouse. Thank you. Thank you, Mr. Cedars. Mr. Drake, your thoughts? Thank you. The only point I would like to make is with respect to the issue of whether or not counsel had indicated true that the agreement allowed Mr. Kleinlein to do with his assets what he wished during his life. But then to suggest that he would have argued a constructive trust if a joint tenancy were created, if a payable on death designation were created, leaving the assets to his sisters, or if a revocable living trust was created, which then created a nonprobate asset. He could have still had a will that comported with the terms of the document, but if he indicated he was free to do so, but also indicated that his client probably would have been in a position of standing here arguing constructive trust, that it violated the intent of the document. And that goes to my main point, that we have very specific provisions internal to this document which cannot be resolved. And I'm not sure they can be resolved with the presentation of extrinsic evidence back at the trial court, primarily because I'm not sure that would even allow the trial court to then completely ignore some provisions and render them meaningless with the input of extrinsic evidence. So we believe that there's just this fundamental conflict. And I know that spouses in Illinois are allowed to disinherit their surviving spouse through use of instruments such as revocable living trust. It happens on a regular basis. There are spousal rights to probate assets. This is a contract that in one part seems to create a spousal right to some of these assets. It's just inconsistent to say, no, he could have divorced her, kept everything, could have given it all away in line. And yet, if he had created payable on debt designations or joint tenancies, we would have ended up in court still. Thank you. Counsel will take this matter under advisement and be in recess.